IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE U.S. SMALL BUSINESS ADMINISTRATION, | : | CIVIL ACTION |
| as Receiver for Acorn Technology Fund, L.P., | : | NO. 05-190 |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| SMITH STRATTON, WISE, HEHER & BRENNAN, LLP.,  ET AL., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

Slomsky, J.                                                    February 6, 2009

### I. Introduction.

Before the Court is the Motion for Summary Judgment of Defendants Acorn Connecticut Investments, LP ("ACI"), Daniel P. Beharry, and Richard D. Propper, MD (collectively, "ACI Defendants").  ACI Defendants sought summary judgment dismissing Receiver's claims for unjust enrichment, negligence, breach of fiduciary duties and civil conspiracy, as well as four counts alleging aiding and abetting breach of fiduciary duties, gross negligence, wrongful conduct, and waste.  For reasons that follow, the Court denies ACI Defendants' Motion for Summary Judgment.

### II.  General Background.

In June 1998, the Acorn Technology Fund, L.P. ("Acorn") applied for a license from the Small Business Administration ("SBA") to operate as a Small Business Investment Company ("SBIC") pursuant to the Small Business Investment Act of 1958 ("the SBIC Act").[1]   John

---

[1] The SBIC Act is codified, as amended, at 15 U.S.C. § 661 et seq.  Its corresponding regulations are codified at Part 107 of Title 13 of the Code of Federal Regulations, 13 C.F.R. § 107.20 et seq.

Torkelsen, who is also a defendant in this case, founded Acorn and acted as Manager and President of Acorn's General Partner, Acorn Technology Partners, LLC ("ATP").   Defendant ACI was a Connecticut limited partnership formed by Daniel P. Beharry in January 1999 for the specific purpose of investing in Acorn, a New Jersey limited partnership and now-defunct capital venture fund.[2]   Beharry was the general partner of ACI.   Richard D. Propper, MD, was initially a limited partner of ACI, and then became a limited partner of Acorn.

Under the SBIC Act and SBA Regulations (the "Regulations"), the SBA provides federal funding to SBIC's to encourage them to invest in small business.   An SBIC-licensed company is eligible to receive two dollars in federal matching funds (also called "Leverage") for every one dollar of private equity raised, subject to statutory maximums.   In exchange, the SBA's investment is paid back first in the event of liquidation.   Before a fund is eligible to receive an SBIC license and permission to leverage, it must typically have available ten million dollars ($10,000,000) to invest. 15 U.S.C. § 682(a)(1)(B); 13 C.F.R. § 107.210(a)(2).   When Torkelsen met Propper in late 1998, he was considerably short of the ten million dollar floor.   (Propper Dep., Receiver Ex. F at 37-38, 46).

The Acorn Fund, which received its license on June 25, 1999 to operate as an SBIC, was ultimately unsuccessful, which required the SBA to expend considerable sums to cover the loss.   The essence of the Receiver's claims is that ACI Defendants were knowledgeable and active participants in a scheme to use Acorn to defraud the SBA out of $32 million and to divert money to themselves

---

[2] Acorn's Agreement of Limited Partnership ("LPA") at § 13.7 provides that obligations imposed by the Agreement shall be governed by New Jersey law.   Retired Judge James T. Giles, to whom this case was previously assigned, determined that "the laws of the State of New Jersey apply to the interpretation of the rights and obligations owing between Acorn and both its general and limited partners."   Receiver v. Smith Stratton et al., C.A. No. 05-190, 2005 U.S. Dist. LEXIS (E.D. Pa. Dec. 15, 2005).

in a variety of ways.

The Receiver alleges that ACI Defendants, although nominally limited partners, actually participated in the management of Acorn and therefore became de facto general partners.  As de facto general partners, they would owe fiduciary duties to Acorn, which they breached by engaging in conduct which caused Acorn to illegally apply for and obtain $32 million in federal funds from the SBA.  Specifically, the Receiver alleges that they invested money in Acorn for purposes of meeting the threshold for SBA funding and increasing the amount of matching funds that could be obtained, with the understanding and agreement that the funding received from the SBA would be used to improperly finance companies in which they also had a financial stake.  (See Rec. Compl. ¶¶ 61, 68-71, 73-76, 103, 108, 116-19).

In January 2003, the United States commenced suit against Acorn.  U.S. v. Acorn Technology Fund, L.P., Civil Action No. 03-0070.  On January 17, 2003, the Court (Giles, J.) placed Acorn in Receivership and appointed the SBA as Receiver for Acorn.  This controversy arises in relation to the Receivership Order.  On December 21, 2004, the SBA requested leave to lift the stay in the receivership in order to pursue claims against certain individuals for tortious conduct and for unjust enrichment.  On January 14, 2005, the SBA commenced the present action.

### III. The Summary Judgment Standard.

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In examining Defendant's motion, we must view the facts in the light most favorable to the Plaintiff and draw all reasonable inferences in his favor.  InterVest, Inc. v. Bloomberg, L.P., 340 F.3d 144, 159-60 (3d Cir.

2003).

The party moving for summary judgment bears the initial burden of demonstrating that there are no genuine issues of material fact.  Fed. R. Civ. P. 56(c).  Once the movant has done so, the opposing party cannot rest on the pleadings.  To defeat summary judgment, the party must come forward with probative evidence establishing the prima facie elements of his claim.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The nonmovant must show more than the "mere existence of a scintilla of evidence" for elements on which he bears the burden of production.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  An inference based upon speculation or conjecture does not create a material fact.  Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n. 12 (3d Cir.1990).

## IV.  Discussion

The Receiver has asserted the following claims against the ACI Defendants: (1) negligence; (2) breach of fiduciary duties; (3) aiding and abetting breach of fiduciary duties; (4) civil conspiracy; (5) aiding and abetting gross negligence; (6) aiding and abetting wrongful conduct; (7) aiding and abetting waste; and (7) unjust enrichment.  These claims will be discussed in turn.

### A. Negligence and Breach of Fiduciary Duty

In order to succeed on its negligence and breach of fiduciary duty claims, the Receiver must show that (1) the ACI defendants owed duties to Acorn; and (2) the ACI Defendants breached those duties.  McKelvey v. Pierce, 800 A.2d 840, 859-860 (N.J. 2002).

**1. ACI Defendants Owed Duties to Acorn**

ACI Defendants argue that limited partners do not owe fiduciary duties to a partnership, and that the Receiver cannot establish that ACI Defendants were <u>de facto</u> general partners of Acorn.  The Court finds that there are material issues of disputed fact as to whether ACI Defendants became <u>de facto</u> general partners of Acorn.

N.J. Stat. Ann. 42:2A-27 outlines the liability of limited partners.  Section (a) states that, subject to exceptions, "a limited partner is not liable for the obligations of the limited partnership unless he is also a general partner, or, in addition to the exercise of his rights and powers as a limited partner, he takes part in the control of the business."  Therefore, the operative question is whether ACI Defendants became <u>de facto</u> general partners or took "part in the control of the business."

Subsection (b) of this statute describes certain "safe harbor" activities, which, if engaged in, do not subject limited partners to liability as a general partner.  Subsection (b) provides in full as follows:

> b. A limited partner does not participate in the control of the business within the meaning of subsection a. solely by doing one or more of the following:
>
> (1) Being a contractor for or an agent or employee of the limited partnership or being a contractor, agent, employee, corporate officer, corporate director, or shareholder of a general partner;
>
> (2) Consulting with or advising a general partner with respect to any matter, including the business of the limited partnership;
>
> (3) Acting as surety, guarantor, or endorser for the limited partnership or assuming one or more specific obligations of the limited partnership or providing collateral for the partnership;
>
> (4) (Deleted by amendment, P.L.1988, c. 130).

(5) (Deleted by amendment, P.L. 1988, c. 130).

(6) Serving as an officer, director or shareholder of a corporate general partner; or

(7) Approving or disapproving matters related to the business of the partnership as shall be stated in the certificate and partnership agreement;

(8) Calling, requesting, attending or participating at a meeting of the partners or the limited partners;

(9) Winding up a limited partnership pursuant to section 52 of P.L. 1983, c. 489 (C. 42:2A-53);

(10) Taking any action required or permitted by law to bring or pursue a derivative action in the right of the limited partnership;

(11) Serving on a committee of the limited partnership or the limited partners;

(12) Proposing, approving or disapproving, by voting (by number, financial interest, class, group or as otherwise provided in the partnership agreement) or otherwise, on one or more of the following matters:
    (a) The dissolution and winding up of the limited partnership;
    (b) The sale, exchange, lease, mortgage, pledge, or other transfer of all or substantially all the assets of the limited partnership other than in the ordinary course of its business;
    (c) The incurrence of indebtedness by the limited partnership other than in the ordinary course of its business;
    (d) A change in the nature of the business;
    (e) The admission, removal or retention of a partner;
    (f) A transaction or other matter involving an actual or potential conflict of interest;
    (g) An amendment to the partnership agreement or certificate of limited partnership; or

(13) Exercising any right or power granted or permitted to limited partners under this chapter and not specifically enumerated in this subsection.

Judge Giles, in earlier denying ACI Defendants' motion to dismiss in the present action, reasoned that the Receiver's allegations, namely that ACI Defendants diverted money into their own pockets, was not covered by safe harbor provision (b)(2) on consulting.  Further, "intentional

misconduct by defendants was not envisioned by the Partnership Agreement and therefore does not come within the provision of 'approving and disapproving matters related to the business of the partnership as . . . stated in the certificate and partnership agreement.'" Receiver v. Smith Stratton et al., C.A. No. 05-190, 2005 U.S. Dist. LEXIS, at *13 (E.D. Pa. Dec. 15, 2005) (quoting N.J. Stat. Ann. 42:2A-27(b)(7).

The Receiver, in response to ACI Defendants' Motion for Summary Judgment, has set forth sufficient evidence to create a genuine issue of material fact as to whether ACI Defendants' actions rendered them de facto general partners of Acorn who exercised concomitant control. This evidence includes a January 11, 1999 letter and ACI Defendants' resulting control over Acorn's investments, fees paid to Beharry and Propper, and other miscellaneous facts. These bases for control will be discussed in turn. The Receiver has put forth evidence on each of these points to show that ACI Defendants committed intentional misconduct and improperly diverted funds, so that their conduct would fall outside of the safe harbor provisions and defeat a Motion for Summary Judgment.

### a. ACI Letter and Control Over Investments

The Receiver alleges that Defendants Torkelsen and Propper implemented a plan whereby Propper funneled money he was raising through his portfolio of companies to Acorn so that it would appear that Acorn had satisfied the ten million dollar threshold required for an SBIC license. (Propper Dep. at 43-46, 51-53). On January 11, 1999, ATP sent Beharry a letter (the "ACI Letter") making representations on behalf of Acorn as its General Partner. The letter pledged debt financing to Medibuy.com ("Medibuy"), French Roast Systems, Inc. ("Fresh Roast") and Infant Advantage in the collective amount of $500,000. An additional $200,000 was to be pledged after ACI satisfied

certain conditions.  (Rec. Ex. O; Ex. P).

In addition, the existence of the ACI letter and its contents were a violation of SBA Regulations.[3]  The ACI letter essentially gave the ACI Defendants the right to renege on their capital commitments.  (Id.)  Because the ACI Defendants' investment capital was conditional, it would not count towards the required $10 million threshold, and the condition should have been disclosed to the SBA.  (See Affidavit and Expert Report of Art Spivey, Rec. Ex. R; Morris Affidavit and Report, Rec. Ex. 1).  In this regard, the Receiver has set forth evidence that the ACI Defendants acted contrary to applicable Regulations.

The Receiver cites the ACI letter as direct evidence of the parties' agreement that ACI monies funneled through Acorn had to be invested back into companies selected by Propper, as noted above.  (Rec. Ex. Q).  The Receiver asserts that the Medibuy, French Roast, and Infant Advantage investments are conflict of interest investments.[4]  Conflict of interest investments are prohibited under Section 107.730 of the Regulations, unless the SBA gives its prior, written consent. It did not do so in this case.  See SBA's 9/14/07 filing in C.A. 03-5982, including Haskins Affidavit, at ¶ 12.

The Receiver explains that the Medibuy investment constituted a conflict of interest because

---

[3] In a related case in the Eastern District of Pennsylvania, No. 03-5982, the Court (Giles, J.) held that this letter constituted a side letter, which was not properly approved nor legally enforceable, and that it was contrary to Propper and Beharry's representations in the LPA § 13.6 (Rec. Ex. B) that they were not operating under any side letters.  ACI Defendants argue that because the letter is invalid, it cannot support a finding that ACI Defendants became de facto general partners of Acorn.  However, for the purpose of determining control, it is irrelevant that the letter is not a valid agreement.  It is the underlying actions described in the letter, which occurred, that lend support to the ACI Defendants becoming de facto general partners.

[4] The Receiver alleges that there may have also been other Acorn portfolio investments in companies in which Beharry or Propper held an interest.  Receiver Brief at p. 24-25.

of Beharry and Propper's undisclosed relationships.  First, Beharry was an Associate of Acorn (known to the SBA) and also a pre-existing Medibuy officer (not disclosed to the SBA).  In April 1999, Beharry twice wrote to Torkelsen stating that his role as general partner of ACI, combined with his status as an officer of Medibuy, rendered Acorn's Medibuy investment conflict-of-interest financing.  (Rec. Ex. H; Rec Ex. T).  Second, Propper was disclosed as an officer of Medibuy, but not as an Acorn associate.  The Receiver claims that the French Roast and Infant Advantage investments presented a conflict of interest as well because Propper was a director of those companies and did not disclose his position to the SBA.

### b. Consulting Relationship

It is undisputed that Propper and his designees received management fees for their dealings with Acorn.  The Receiver alleges that Propper and Beharry had an illegal consulting agreement with Acorn through which these defendants received kickbacks for raising about half of the private capital that Acorn needed for licensing.  ACI Defendants claim that these management fees were properly earned and disbursed.

In December 1998, Torkelsen and Propper drew up an unsigned agreement, providing that Propper, through the "Propper Group," would be paid consulting and incentive fees based on the amount of capital Propper brought to Acorn.  (See Rec. Ex. 6).  Another unsigned draft of the agreement was circulated around January 11, 1999, in which the "Propper Group" was replaced by the "Beharry Group," and fees were tied to how much Propper and Beharry brought to Acorn.  (See Rec. Ex. 7).  While no agreement was memorialized in writing at the time, Torkelsen and Propper reached an agreement to split management fees.  Propper would receive 40% of the fees, and Beharry

would receive 15% of Propper's share (Propper's Interrogatory Answers, Rec. Ex. 8 at No. 18; Beharry's Interrogatory Answers, Rec. Ex. 9 at No. 8).[5]

Acorn paid ACI Defendants $420,630 in consulting fees from September 30, 1999 through December 31, 1999.  (Propper Dec. ¶ 21-22).  Additional fees were paid over the first three quarters of 2000 to bring the total to $795,660.50.  These payments were made through PB Partners, which consisted solely of Propper and Beharry (Propper 2008 Dep. at 202-207; Beharry Dep. at 375-394).[6]

Defendant claims these payments were made pursuant to a written, signed agreement to provide consulting services.  (Id.).  Defendant also asserts that consulting activities fall within the statute's safe harbor.

The determination whether consulting activities fall with the safe harbor is a "factual one." Limited partners may not always engage in perceived safe harbor activities "without fear of liability in view of the weight their advice is likely to carry."  Gast v. Petsinger, 323 A.2d 371, 375 (Pa. Super. 1974).[7]  Given the degree of influence ACI Defendants had over investments, as detailed above, at the summaruy judgment stage, the Receiver has alleged sufficient facts to show that the ACI Defendants do not come within the safe harbor.  Moreover, although the written consulting agreement asserted by ACI Defendants is dated November 22, 1999, the evidence shows that this document was created in late 2000, after the fees were actually disbursed.  There is evidence from which a fact finder could determine that the agreement was purposefully backdated to deceive the

---

[5] According to the Receiver, there is evidence that Propper actually received a 50% share, of which Beharry received 15%.  See Receiver's response at p. 16.

[6] At different times, this entity was called PB Partners and RP Associates.

[7] Although this is a Pennsylvania case, the Court relied on case law in numerous jurisdictions interpreting statutes with the same control standard to reach this result.

SBA and auditors.  (Rec. Ex. UU, TT).  Receiver has also set forth other evidence that ACI Defendants purposefully engaged in a cover up, and that PB Partners was actually a shell entity, which did not perform any legitimate services.  Viewed collectively, this evidence is sufficient to create a genuine dispute of material fact as to whether ACI Defendants' alleged "consulting" activities constituted an exercise of control and rendered them <u>de facto</u> general partners.

### c. Other Evidence of Control

The Receiver also cites a number of miscellaneous points to show ACI Defendants' control of Acorn.

First, Plaintiffs cites Propper's financial entanglements with ACI, including Propper's directing a loan to his friend with ACI money on March 2, 1999 (Rec. Ex. K at p. 1; Beharry Dep., Rec. Ex. L at 510-512); an April 5, 1999 letter from Beharry to Propper in which Beharry asks Propper how to resolve outstanding issues involving ACI investors (Rec. Ex. M); and ACI wiring $300,000 directly into Propper's bank account on November 26, 1999 (Rec. Ex. N).

Second, on Propper's personal federal income tax return for 1999, he represented that his Acorn investment was a "non-passive" loss.  The Receiver's expert, Bruce Hall, CPA, opined that Propper could have only legitimately reported this status if he was directly and significantly involved with the day-to-day management and/or operations of Acorn.  (<u>See</u> redacted tax returns of Propper, Rec. Ex. V; Treas. Reg. § 1.469-5T(f)(2)(ii)(A); Rec. Ex. 15).  Propper also admitted to participating in the management and affairs of Acorn.  (Rec. Ex. G; Rec. Ex. H).

Third, Propper prepared an "ACI Partner Deal" memo in 1999 in which he stated that, "as the principal member of the investment committee," he was promised certain benefits.  (Rec. Ex. G).

Finally, the Receiver alleges that an illegal loan occurred involving Propper, Beharry, and Torkelsen.  The Receiver claims that in September 1999, these individuals arranged for California Bank & Trust ("CBT") to loan $1 million to Propper, which Acorn, in violation of Regulations, guaranteed.  (See Commercial Guaranty, Rec. Ex. II).  The Receiver further claims that, at the same time, Torkelsen executed a $1 million promissory note in favor of Propper and faxed it to Beharry (Rec. Ex. JJ), and that after the SBA provided Acorn with federal matching funds, Torkelsen had Acorn pay off the loan, with interest (Rec. Ex. KK).

The Receiver explains that this loan was illegal because a guarantee is a form of financing. 13 C.F.R. § 107.820.  Because Propper was not a qualified "Small Business," the financing was illegal under 13 C.F.R. § 107.700.  The Receiver also argues that because Acorn paid off the loan, the transaction can be viewed as CBT loaning money to Propper, who in turn loaned the money to Acorn.  To the extent that Propper made a loan to Acorn, it was illegal because Propper is not a "regulated financial institution" under 13 C.F.R. § 107.570(b)(2).  According to the Receiver, the Defendants also failed to make a number of required disclosures pertaining to these loans.  Together, these allegations of improper actions on the part of ACI Defendants are sufficient to find that there is a genuine material issue of disputed fact as to whether ACI Defendants took "control" of Acorn for purposes of N.J. Stat. Ann. 42:2A-27 and became de facto general partners.

### 2. ACI Defendants Breach Duties Owed to Acorn

Judge Giles, in denying ACI Defendants' motion to dismiss, ruled that while violation of a statutory duty of care does not constitute negligence per se, it is evidence that can be considered by a finder of fact in determining breach of the duty of care.  Receiver v. Smith Stratton et al., 2005 U.S.

Dist. LEXIS 33289, at *15-16 (citing Braitman v. Overlook Terrace Corp., 346 A.2d 76, 85 (N.J. 1975); Mattero v. Silverman, 176 A.2d 270, 275 (N.J. Super. Ct. App. Div. 1962)).  Therefore, the Court found that "the SBA's allegations that defendants violated their duty of care to Acorn by engaging in conduct, or causing Acorn to engage in conduct, that violated the [SBA] Act and its regulations may be presented for the purposes of attempting to persuade the factfinder that defendants' conduct was negligent under state law."  Id.

Because the Receiver has set forth evidence that ACI Defendants violated SBA Regulations, there is a genuine issue of material fact as to whether ACI Defendants breached the duty of care which they may have owed to Acorn.[8]  The evidence put forth to show control also demonstrates ways in which ACI Defendants may have breached their duties.  Namely, the evidence suggests alleged conflict of interest financing not disclosed to the SBA in violation of the Regulations; an impermissible agreement to pay management fees to ACI Defendants and receipt of illicit fees received thereunder; Propper and Beharry's alleged false statements that their investment commitments were not unconditional; and the million dollar loan from CB&T, illegally guaranteed by Acorn.  Viewed in the light most favorable to Receiver, this evidence is sufficient to defeat ACI Defendants' Motion for Summary Judgment.

---

[8] ACI Defendants argue that the Acorn LPA is the only document that governs the rights, duties, and obligations between Acorn and its partners.  However, the SBIC and its Regulations have supremacy over the Acorn LPA.  ACI Defendants also argue that the SBIC Act and Regulations do not form the basis for a private right of action.  This argument misconceives the nature of Receiver's suit.  The Receiver bases its action in common law principles.  The SBIC Act and Regulations are only factors to be considered in assessing the applicable standard of care, not the avenue for bringing the action.

**B. Civil Conspiracy/ Aiding and Abetting Various Torts[9]**

A civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another' and 'an overt act that results in damage.'" Morgan v. Union County Bd. of Chosen Freeholders, 633 A.2d 985, 998 (N.J. Super. Ct. App. Div. 1993) (quoting Rotermund v. U.S. Steel Corp., 474 F.2d 1139, 1145 (8th Cir. 1973)). A party who "understand[s] the general objectives of the scheme, accept[s] them, and agree[s], either explicitly or implicitly, to do [his] part to further them" may be liable for civil conspiracy. Banco Popular N. Am. v. Gandi, 876 A.2d 253, 263 (N.J. 2005) (quoting Jones v. City of Chicago, 856 F.2d 985, 992 (7th Cir. 1988)).

Judge Giles, in denying ACI Defendants' motion to dismiss, ruled that "jointly causing Acorn to violate the Act and its regulations is the type of illegal activity which satisfies all the elements of a civil conspiracy." Receiver v. Smith Stratton et al., 2005 U.S. Dist. LEXIS 33289, at *15-16. Therefore, to defeat summary judgment, the Receiver must show that there is a genuine issue of

---

[9] In ACI Defendants' Motion for Summary Judgment, they assert that the "economic loss doctrine" bars the Receiver from advancing any torts claims against them. This argument was already rejected by Judge Giles when he denied the ACI Defendants' Motion to Dismiss. He explained:

> When the relationship between parties in an action arises solely from contract, and thus the only duties owing between the parties are contractual in nature, courts impose the economic loss doctrine to limit their recovery to the terms of the contract. Saltiel v. GSI Consultants, Inc., 170 N.J. 297, 788 A.2d 268, 275-76 (N.J. 2002). Here, the complaint has alleged the basis for non-contractual duties owed by defendants to Acorn, and therefore, the economic loss doctrine is inapplicable.

Receiver v. Smith Stratton et al., 2005 U.S. Dist. LEXIS 33289, at *17.

material fact as to whether the ACI Defendants implicitly or explicitly agreed amongst themselves or with Torkelsen to cause Acorn to violate the SBIA and its associated Regulations.  As previously explained, the Receiver has met this factual threshold.  These same facts are sufficient to defeat summary judgment on Receiver's claims for aiding and abetting breach of fiduciary duties,[10] gross negligence,[11] wrongful conduct, and waste.[12]

## C. Unjust Enrichment

The Receiver has set forth evidence that ACI Defendants received management fees which may have been impermissible, either because no appropriate services were performed, or because no non-sham agreement under which the services were performed was disclosed.  The Receiver has also put forth evidence that ACI Defendants diverted Acorn's funds into companies in which they had financial interests, pursuant to the ACI Letter, an agreement which the Court (Giles, J.) found was not properly disclosed and was impermissible under SBA Regulations in the related case.  This evidence is sufficient to defeat ACI Defendants' Motion for Summary Judgment on the claim of unjust enrichment.

---

[10] The Third Circuit has described gross negligence as "the want of even scant care and the failure to exercise even that care which a careless person would use."  Fialkowski v. Greenwich Home for Children, Inc., 921 F.2d 459, 462 (3d Cir. 1990) (internal citations and quotation marks omitted).

[11] New Jersey law recognizes that a fiduciary is liable for harm resulting from a breach of duties imposed by the existence of a fiduciary relationship.  McKelvey v. Pierce, 800 A.2d 840, 859-860 (N.J. 2002).

[12] New Jersey courts recognize that corporate waste, or diversion of assets for an improper purpose, may serve as grounds for a derivative actions against a corporation by a shareholder.  See Mayer v. Oxidation Products Co., Inc., 159 A.377, 379 (N.J. Chancery 1932). In this case, the Receiver is the appropriate party to bring a derivative action.

### V.  Conclusion.

For the foregoing reasons, the Court denies ACI Defendants' Motion for Summary Judgment.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE U.S. SMALL BUSINESS | : | CIVIL ACTION |
| ADMINISTRATION, | : | |
| as Receiver for Acorn Technology Fund, L.P., | : | NO. 05-190 |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| SMITH STRATTON, WISE, HEHER & | : | |
| BRENNAN, LLP., ET AL., | : | |
| | : | |
| Defendants. | : | |

## <u>ORDER</u>

AND NOW, this 6th day of February, 2009, upon consideration of ACI Defendants' Motion for Summary Judgment (Doc. No. 211), Receiver's Response (Doc. No. 216), and ACI Defendants' Reply (Doc. No. 223), and for the reasons set forth in the attached Memorandum, it is hereby ORDERED that ACI Defendants' Motion is DENIED.

BY THE COURT:

        S/ Joel H. Slomsky
                        J.